Washburn, J.
In Medina county there are about ten telephone exchanges, owned and conducted by five or six different corporations. The plaintiff is one of such corporations, and the defendant is another.
The territory covered by the operation of the defendant’s exchange includes Medina, the county seat, and extends into the country immediately adjoining the city, for some distance. The territory covered by the operation of the plaintiff’s exchange *290 is in the country and adjoins the defendant’s territory on the southeast. There is another exchange south of the Medina exchange, which joins the territory of the defendant company on the south and also joins the territory of the plaintiff company on the western side. There is an exchange joining the plaintiff’s territory on the east and south. None of these exchanges are more than five or six miles apart, and some of them operate telephone lines within the territory of the plaintiff company, to some extent. There are also other exchanges in different parts of the county.
Along the line where the territories of the plaintiff and defendant join, known as the Paradise road, both companies have telephone lines and subscribers. Some of these various exchanges throughout the county have connection with each other, and all of them connect with the defendant’s exchange at the county seat. But the plaintiff has no connection with other exchanges in the county, except through the’ defendant’s exchange. The defendant company has connection with a long distance line, but plaintiff has no such connection, except’through and by virtue of defendant’s exchange.
This being the situation, in May, 1910, the plaintiff and defendant entered into the contract, a violation of which it is sought to enjoin in this action. By that contract it was agreed, among other things, that the defendant should furnish to the subscribers of the plaintiff company free service in talking with the subscribers of the defendant company, but the defendant company reserved the right to charge its subscribers a toll for talking with the plaintiff’s subscribers, if it saw fit to do so; and it was agreed that the plaintiff should furnish to the subscribers of the defendant, free service in talking» with the subscribers of the plaintiff, but the plaintiff reserved the right to charge its subscribers a toll for talking with the defendant’s subscribers, if it saw fit to do so.
A certain part of Medina county was set’ apart and designated on a map as the territory of the plaintiff, and another part of Medina county was designated as the territory of the defendant, and each company agreed not to build or extend any telephone lines outside of the territory thus assigned to each company. By said contract,' the parties “mutually agree that neither will make *291 any connection or interchange in telephone service with any person, firm or corporation operating any telephone lines within” the territory set apart to the other, "without the written consent of both parties to this agreement. ” As to the territory that was within both the territory set apart to the plaintiff and the the territory set apart to the defendant, that is, along the Paradise road, where the two territories join, it was agreed that the "conditions shall remain as they are now are, and neither party to this agreement will supplant a telephone of the other party, without its written consent.”
The defendant company violated this contract by discontinuing free service to plaintiff’s subscribers, and this action is prosecuted to enjoin a continuation of such violation of the contract.
The first claim of the defendant is that its officers, who assumed to act for it in entering into the contract, had no authority to make the contract on behalf of the defendant company. On that claim, the court finds against the defendant, holding that, considering the action of the directors of the defendant company, as shown by its records and the oral testimony, and considering the acts and conducts of the defendant, through its officers and agents, in carrying out the terms of the contract, said contract was the contract of the defendant, duly and legally entered into, and so far as its execution is concerned, is binding on the defendant company.
The jurisdiction of the court to enforce this contract is also questioned by the defendant, the claim being that the effect of the relief asked is to grant specific performance of this contract, and it is urged that a court of equity will not grant such relief as to a contract, the performance of which requires continuous acts, involving skill, judgment and technical knowledge.
The court recognizes such to be the general rule, but in a case where the interests of the public were involved, in a litigation between private corporations, Chief Justice Fuller of the Supreme Court of the United States, has this to say:
"It must not be forgotten that in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has *292 contrived its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated; and has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.” 163 U. S., 564.
Where the rights of the public are involved in the contract, and the best interests of the public will be subserved by enforcement of the contract, courts of equity will grant such relief, especially where that can be done by a decree which is complete in itself, such as is asked in this case. That this is not in conflict with the Ohio Supreme Court decision reported in the 48 Ohio State, page 324, see 13 C.C.(N.S.), at page 351. See also 4 C.C.(N.S.), 191.
It is also claimed by the defendant that this contract is against public policy, and therefore void. First, it is urged that such a contract is prohibited by what is known as the Valentine antitrust law. If this was a criminal prosecution under that act, it. might be that the contention of plaintiff that the telephone business is not included within the comprehensive terms, "trade or commerce,” used in said act, would have to be sustained, in view of the decision of the Supreme Court in the 28th' Ohio St., at page 521; but the strict construction required in criminal cases does not necessarily apply to the question of public policy, and if there was no other legislation in the state upon the subject of telephones, it might well be said that this act was intended by the Legislature to express a public policy against restriction of competition in the telephone business. There are, however, other acts of the Legislature, expressive of a public policy i*elating to the subject of telephone companies, which, considering their history, with the aid of familiar rules of construction, are controlling, so far as they are in any apparent or real conflict with such anti-trust law.
By Section 9171 of the code, a telephone company is authorized to "join with any other such company in conducting, owning, using or maintaining such line or lines, upon such terms as may be agreed upon” by the companies.
*293 Plaintiff claims that the contract in this case is authorized by this section, and an argument is made which construes the statute to sanction the exclusive provisions of the contract in question, but this view of the statute entirely overlooks the provisions of Section 9182 of the General Code which was enacted at the same time that Section 9171 was enacted, and as a part of the same act.
By Section 9182, expressly made applicable to telephone companies, the right of telegraph companies to join with each other in conducting, leasing, owning and using or managing telegraph lines, is restricted to such contracts as will furnish indiscriminate service to the public. That section reads:
“Every company, incorporated or unincorporated, operating a telegraph line in this state, shall receive dispatches from and for other telegraph lines, and from or for any individual; and on payment of its usual charges for transmitting dispatches as established by the rules and regulations of the company, transmit them with impartiallity and good faith,”
These acts of the Legislature, as I have said, are by another section of the code made applicable to telephone companies, and they are enactments of the Legislature which have long been upon the statute books of the state, and they have been construed by the Supreme Court of the state.
In a ease reported in the 36th Ohio St., 296, the facts were that the Columbus Telephone Company, owning and operating an exchange in Columbus, was using telephones under a lease from the Bell Telephone Company, by which the Columbus Telephone Company agreed not to furnish service to a proposed subscriber who was engaged in the telegraph business, except the Western Union Telegraph Company, with which the Bell Telephone Company had contracted to give the exclusive right to use said telephone system and exchange for the purpose of collecting and distributing telegraphic messages.
The B. & O. Railroad Company, which was engaged in the telegraph business and desired to become a subscriber of the Columbus Telephone Company, was willing to comply with the rules and regulations .of the Columbus Telephone Company, and the latter company having refused to extend its service to the *294 B. & O. Company, suit was brought to compel it to do so. The order of the court compelled the Columbus Telephone Company to extend such service to the B. & O. Company, holding that its contract with the Bell Telephone Company was against public policy and void, because, under said statute, it was the duty of the Columbus Telephone Company to furnish service to any one within the sphere of its operations who desired to become a subscriber and was willing to comply with its rules and regulations. In other words, the Supreme Court determined thait said statutes established the public policy of the state to be that telephone companies should furnish indiscriminate service, at least within the sphere of their active operations, to all who were similarly situated. That was the settled public policy of this state, as established by the Legislature and the decisions of the Supreme Court, when the contract in question was entered into.
Under that public policy, it was therefore the duty of the plaintiff to accept as a subscriber anyone along the Paradise road, which was within the sphere of its operation, who desired to become such subscriber and was willing to comply with the rules and regulations of the company. A like duty rested upon the defendant company. By this contract, each company agreed not to discharge that duty as to anyone who was then a subscriber of the other company. This part of the contract, being prohibited by statute, is against public policy and void, without reference to whether the restraint be reasonable or unreasonable. 92 N. E., 206.
In addition to that, each company was granted the right by the public, and for the benefit of the public, to extend its lines and operate its telephone business over the entire territory occupied by the other. Being public service corporations, had they the legal right to contract mot to so extend their lines and operations ?
If the contract had provided for absolutely free, or even nondiseriminatory service, between the two exchanges, then, so far as this provision of the contract was concerned, the contract would have been legal, for that would have been, in fact (in so far as the public duty was concerned),,extending their lin.es <and operation over the entire territory of each; but such was not *295 the contract, and the discriminatory character of the contract is apparent in the situation now existing while both companies are operating strictly in accordance with the agreement. A subscriber in Medina is required to pay five cents to call up and talk with a subscriber of the plaintiff company, while the same subscriber of the plaintiff may call up and talk with the same subscriber at Medina free of charge.
It may be suggested that the companies owed no duty to make the service non-discriminatory as to the subscribers of both companies. Granting that that is so, while each company serves only its own subscribers and confines itself merely to the operation of its own exchange, it may well he said that by the enlargement of their operation and service, they enlarge the sphere of .their public duty, and if they combine, as they may do under the statutes, to jointly serve thesubscrihers of both companies, then to the extent of the joint service, it seems to me, there must be no discrimination; at least, equity will not enforce a contract which provides for any discrimination in service among those similarly situated.
There is another feature of this contract, which raises a question which has been answered in different ways by different courts. The situation is that there is a group of independent country exchanges close together, and the city exchange at the county seat. The plaintiff, one of the country exchanges, bound itself by this contract not to connect with the other country exchanges. It also bound itself not to connect with any long-' distance line that should be constructed in its territory.
Now, granting that under its charter powers, the plaintiff was not required to furnish a connection with a long-distance company, or to connect with its neighboring country exchanges, so long as it confined itself to the operation merely of its local exchange, can it be said that after connecting with one long-distance line, reaching the people in a certain territory, it is not its duty, on reasonable and fair terms to it, to connect its exchange with another long-distance line reaching the same or another territory, thus giving its subscribers an opportunity for competitive or enlarged communication with the outside world? Having permitted one long-distance connection, it had a right to *296 permit others, and was it not its duty to do so, in the sense of its not having a right to contract not to do so ?
The provision in the contract which bound the country exchange not to “make any connection or interchange in telephone service with any person, firm or corporation operating any telephone lines within the territory” set apart and designated by said contract as the territory of either the plaintiff or defendant, not only bound the plaintiff not to give its patrons long-distance service except through the exchange of defendant, but it also bound the country exchange not to connect or co-operate with or exchange business with any rival company which should build an exchange at the county seat, and it bound the country exchange not to connect with its neighboring country exchanges. Having connected with one neighboring and outside exchange, to-wit, the defendant company, could "it legally bind itself not to connect, upon as favorable terms, with its other neighboring exchanges ?
There is a very able decision by the Supreme Court of Indiana, to the effect that the act of' connecting with one neighboring exchange would enlarge plaintiff’s duty and prohibit it from agreeing not to treat its neighbors, similarly situated, alike. The State v. Caldwallader, 87 N. E., 644.
A later case, by the same Supreme Court, will be found, upon close examination, not to modify the above case. 92 N. E., 558.
A contraview is taken by the Supreme Court of New York, found reported in the 112 N. Y. Supl., 424.
The Ohio authorities are also in conflict, Judge Tayler adopting the Indiana view .and the third circuit court, by a majority vote, taking the New York view. 16 O. Fed. Dec., 370; 13 C.C.(N.S.), 337.
In my judgment, Judge Taylor’s opinion expresses a sound public policy, in keeping with the progress of the times. A public service corporation derives all its powers and its very existence from the public. Public policy demands that it charge such rates as will yield a revenue sufficient to enable it to supply the public wants, and at the same time enable it to earn a reasonable return upon the capital invested, and no more. Unmistakably, it is the policy of the public to bring public service corporations *297 under the supervision and control of public authorities, so as to limit ‘them to a fair return for the capital invested. As this is accomplished, they become mere agents, to serve the public, and public policy demands that they furnish indiscriminate service, and that precludes all gifts or free service, which can not be furnished except at the expense of paying patrons.
This public policy, as to all public service corporations, was declared in statutory form by the last Legislature (102 Ohio Laws, p. 549). But as I have said, such public policy had been established as to telephone companies long before the present contract was entered into.
Both the plaintiff and the defendant by this contract agreed not to perform their public duty as to persons residing in territory along the Paradise road. Having combined to serve the subscribers of both companies, they agreed that such service should be discriminatory as between the subscribers of the two exchanges.
They each agreed not to build or operate in each other’s territory, nor connect with the competitors of either, in such territory. The contract, therefore, is in some respects against the public policy of the state, and a court of equity will not enforce it in any part unless the good can be separated from the bad.
Here was a promise to do acts, some of which were legal and some of which were illegal, and the consideration for that promise on the part of the plaintiff was a promise on the part of the defendant to do several acts, part of which were legal and part illegal. The whole promise of one was the consideration for the whole promise of the other, and while the general rule is that wherever the unlawful 'part of the contract can be separated from the rest, it will be rejected, and the remainder enforced, that can not be done in a ease like this. 20 O. St., 431; 117 Am. St., 479.
It does not take an acute mind to readily see that this contract would not have been entered into on the part of the defendant company but for these objectionable provisions, and the consideration being in part unlawful, the contract can not be enforced in any part.
The decree of the court therefore is that the petition of the plaintiff be dismissed.